UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ECO HEATING SYSTEMS,
GRONINGEN, B.V.,

      Plaintiff,

v.                                                                                    Case No. 15-13193

HAMILTON ENGINEERING, INC.,                                    HON. AVERN COHN

      Defendant.

_____/

**MEMORANDUM AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 31)**
**AND**
**ENFORCING THE FOREIGN JUDGMENT**
**AND**
**DISMISSING PLAINTIFF'S COUNTERCLAIM**

I.  Introduction

This is an action to recognize and enforce a foreign money judgment under

Michigan's Uniform Foreign-Country Money Judgment Recognition Act, M.C.L.

§ 691.1131.  Plaintiff ECO Heating Systems Groningen, B.V. (ECO), a Dutch company

located in the Netherlands, had a contract with defendant Hamilton Engineering, Inc.

(Hamilton) under which ECO supplied Hamilton with heat engines for the North

American market.  After Hamilton failed to pay for the engines, ECO sued Hamilton in

the Netherlands and obtained a judgment by default in the amount of EUR 1,006,013.32

plus 5% interest, costs of EUR 7,156.29 plus 8.05% interest, and additional costs of

EUR 199 plus 8.05% interest.

ECO then filed suit in federal court, invoking diversity jurisdiction, seeking to

enforce the judgment. Hamilton counterclaimed, claiming that ECO breached the contract essentially by supplying a defective product.

Before the Court is ECO's motion for summary judgment, contenting that the judgment is valid and Hamilton's counterclaim fails because it is either barred by the statute of limitations or fails on the merits. Hamilton says that the judgment is invalid because (1) the Dutch court lacked personal jurisdiction and (2) the parties agreed to arbitration. Hamilton also says its counterclaim is viable. (Doc. 37).

The motion is fully briefed. See Docs. 31, 37, 40. The Court heard oral argument after which it received supplemental briefs. See Docs. 42, 43, 44, 45. The matter is now ready for decision. For the reasons that follow, ECO's motion will be granted. The judgment will be recognized and Hamilton's counterclaim will be dismissed.

## II. Procedural History

ECO filed the complaint seeking to enforce the judgment. (Doc. 1). Hamilton filed an answer and affirmative defenses (Doc. 7) and a counterclaim (Doc. 8) asserting a single claim for breach of contract.

Shortly after these filings, ECO filed a motion for judgment on the pleadings, essentially presenting the same arguments raised in the instant summary judgment motion, i.e. the judgment is valid and must be enforced and Hamilton's counterclaim must be dismissed. (Doc. 11). Hamilton, responded, also with similar arguments to defeat summary judgment, i.e. the judgment is void and its counterclaim is properly before the Court. (Doc. 13). The Court held a hearing on the motion on April 5, 2016. (Doc. 24). After argument, the Court agreed to the motion hearing over for two weeks in

the hope that the parties would resolve the matter. That unfortunately did not happen.

In June of 2016, the Court was informed that ECO would be withdrawing the motion for judgment on the pleadings. The Court then set a status conference. Prior to the conference, counsel for ECO was replaced with new counsel. <u>See</u> Doc. 23. ECO, through new counsel, withdrew the motion for judgment on the pleadings. (Doc. 25). It is not clear whether new counsel for ECO and counsel for Hamilton engaged in meaningful settlement discussions.

Thereafter, ECO filed the instant motion for summary judgment. (Doc. 31).

### III. Factual Background

Although the parties disagree on many facts, the relevant facts are largely undisputed and are gleaned from the Joint Statement of Facts (Doc. 40).

#### A. The Parties and the Working Agreement

ECO, located in the Netherlands, designs and manufactures heat engines that are used in commercial water heaters and boilers. Hamilton, a Michigan company located in Livonia, sells water heaters and boilers to customers in the North American market.

In 2003, Hamilton's President and CEO, Jeff Deal (Deal) was first informed of the existence of ECO through Charles Fenner. Fenner was the salesperson for Giannoni France, the heat exchanger supplier to ECO. Fenner introduced Deal to ECO because Hamilton was looking for sources of supply outside the United States.

In February, 2004, Deal met ECO at a trade fair in Utrecht, the Netherlands. After meeting at the trade fair, Deal visited ECO's facility in the Netherlands to learn about ECO and its products.

While back in the United States, Deal sent an email to ECO with specifications for product design and controls, and asked ECO to provide estimates on five different models of heat engines for sale in the North American market.

After continued discussions with ECO over email, Deal visited ECO in the Netherlands a second time.

After this second visit, Deal sent an email recapping the meeting and outlining various proposed terms for the business relationship between Hamilton and ECO.

Deal visited ECO in the Netherlands in November of 2004. During this visit, the parties continued their discussions regarding the sale of heat engines to Hamilton, and discussed the terms of a working agreement to govern their relationship. Deal also participated in several technical meetings with ECO.

In January of 2005, ECO and Hamilton entered into a Working Agreement. The Working Agreement was drafted by ECO in the Netherlands and ECO signed it in the Netherlands. It was then sent, presumably via email, to Deal. Deal signed it on behalf of Hamilton in Michigan.

Under the Working Agreement, ECO agreed to supply heat engines to Hamilton in exchange for compensation. Specifically, ECO agreed to supply heat engines on demand and Hamilton agreed to purchase 7500 units (within a three year period) at the prices listed on Appendix B to the Working Agreement. The three years could also be extended. The heat engines supplied by ECO contained heat exchangers made by Giannoni.

Hamilton was invoiced in Euros. Hamilton paid ECO by remitting payment in dollars to ECO's bank in the Netherlands. ECO's bank in the Netherlands exchanged

the dollar payments from Hamilton in Euros in accordance with the Working Agreement.

Under the Working Agreement, any disputes between ECO and Hamilton were to be resolved as follows:

> As good partners, Hamilton and [ECO] should settle disputes themselves.  In the case parties cannot handle a dispute, the issue shall be settled face to face with Mr. Charles Fenner as an arbitrator.  Swiss law is applicable to this working agreement.

The Working Agreement does not specify jurisdiction or venue for any such arbitration. The Working Agreement also does not specify what happens if Fenner is unable or refuses to arbitrate any dispute.

ECO says that after the Working Agreement was in place, Deal "made multiple trips to the Netherlands from 2004 to 2013."  Hamilton disputes this and says Deal's in-person visits to the Netherlands were not frequent.  In his affidavit, Deal says that face-to-face meetings took place in many countries, as follows (1) the United States, Michigan (10 or more times), New York (3 times), and Las Vegas (1 time); and (2) Germany (4-5 times); (3) Italy (2 times); (4) France (3 times).

Meanwhile in October 2008, the parties extended the Working Agreement.  In a Second Working Agreement, which was Hamilton also agreed to a payment plan for outstanding invoices.  It does not contain a provision for dispute resolution and appears to be more a draft working agreement.

In November 2009, the parties signed a Third Amendment to the Working Agreement.  It has mostly to do with warehousing - Hamilton would transfer ownership of a stock of ECO's heat engines to ECO and the heat engines would be held by ECO in a warehouse in Michigan.

Meeting notes in the record indicate that Deal had meetings with ECO in the Netherlands after the Working Agreement was entered on the following approximate dates: (1) October 19, 2006, (2) July 25, 2007, (3) September 24, 2008, (4) November 2008, (5) March 11, 2009, (6) May 4, 2010, (7) December 6, 2011, (8) October 30, 2012, (9) November 9, 2013. The latter meetings often discussed Hamilton's failure to make payments due to ECO. The 2013 meeting focused on winding down the parties' relationship.

### B. The Relationship Sours/Arbitration

At some point after the Working Agreement was in place, the parties' relationship soured. ECO says that Hamilton failed to make payments as directed. Hamilton does not deny it failed to make payments but says it is entitled to a set-off for any damages in light of the defective nature of ECO's product.

ECO says that it tried many times and for a long time to reach a deal with Hamilton on a fixed back pay plan, but no agreement could be reached. In a further effort to resolve the dispute, ECO—through its lawyer—contacted Fenner to arbitrate the dispute. Fenner, however, refused to arbitrate and told ECO that his personal friendship with Deal kept him from being an impartial arbitrator.

It then appears that the parties discussed alternative means for arbitration. The record contains two letters from Hamilton's counsel to ECO's counsel in the Netherlands, dated October 21, 2014 and October 28, 2014. From a review of these letters, it can be gleaned that ECO initially refused to arbitrate because Fenner was not available. ECO later proposed that the parties submit their dispute to ICC Arbitration or the Dutch Civil Court. Hamilton did not agree to ICC Arbitration because of ECO's prior

6

refusal and the cost of such arbitration. Hamilton also objected to having the dispute resolved in a Dutch Civil Court due to jurisdictional concerns. Hamilton did, however, agree to submit to the jurisdiction of the federal district court in this district. Hamilton also offered to engage in settlement negotiations with ECO's principal, the parties' attorneys, and "the Bank representative who controls Hamilton's finances and ability to disseminate payments." ECO apparently did not agree to Hamilton's proposals.

Hamilton's counsel, in an October 2014 letter sums up what appears to be the final correspondence before litigation. After stating that Hamilton will submit a final written settlement offer, the letter goes on:

> Hamilton is frustrated by ECO's constantly changing position regarding the appropriate venue for adjudication of the parties' dispute as well as its refusal to participate in a final settlement conference . . . . ECO has always contended that the parties are not obligated to submit this dispute to ICC arbitration because Mr. Fenner is not qualified to hear the case, has a conflict, and is not willing to arbitrate it. In addition, ECO repeatedly stated, in writing, that it intended to initiate a civil action against Hamilton in Michigan if the case did not settle. Now, contrary to ECO's prior position memorialized in writing on a myriad of occasions, ECO contends that either a Dutch court of ICC arbitrations, rather than a civil action in Federal Court in Michigan, is the appropriate venue to resolve the parties' dispute. As confirmed in my October 21, 2014 correspondence, Hamilton will not, and is not required to, submit the dispute to the ICC arbitration and will never consent to the jurisdiction of or participate in a legal proceeding before a Dutch Court.

## C. ECO sues Hamilton in the Netherlands

At some point after this correspondence, ECO contacted a Swiss lawyer to advise which court would have jurisdiction in this situation based on Swiss international private law because Swiss law applies to the Working Agreement. ECO concluded that based on Swiss law, because none the parties were linked to Switzerland, the Swiss courts did not have jurisdiction, and jurisdiction would have to be determined by Dutch

law.  ECO concluded that based on Dutch international private law, the Netherlands court was the proper court.

As such, in December 2014, ECO filed suit in the District Court of Noord-Nederland, Netherlands.  Hamilton was served but did not appear in the action.

On April 29, 2015, the Netherlands court entered a judgment against Hamilton in favor of ECO in the amount noted above.  The judgment, in Dutch and translated into English, is in the record.

A few months later, on September 9, 2015, ECO filed this action seeking recognition of the  judgment against Hamilton in Michigan under the FCMJRA.

### D.  Canadian Litigation

Meanwhile, and <u>before ECO filed suit in the Netherlands</u>, ECO and Hamilton became involved in an action which apparently is still pending in the Canadian Courts. It is not clear that the record contain all of the relevant documents in the Canadian litigation.  From what can be gleaned, in 2013, Hamilton and others were sued in Canada by a customer, an apartment complex.  ECO was brought in as a third party by Hamilton.  ECO filed a counterclaim against Hamilton in May of 2014.  The counterclaim references the Working Agreement and says the parties' dispute is subject to arbitration and demands payment due under the Working Agreement.  Hamilton says it resolved the main dispute (essentially an insurance dispute) but ECO has refused to dismiss the counterclaim.

At the time of the motion for judgment on the pleadings, ECO said it will dismiss the counterclaim if (1) Hamilton agreed it would have no effect on ECO's case in this court and (2) Hamilton would not bring the Canadian claim against ECO in the United

States. The status of this proposal is not known.

IV. Legal Standard

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©. There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

V. Discussion

A. The FCMJRA

Michigan's Uniform Foreign-Country Money Judgment Recognition Act (FCMJRA) provides a mechanism to obtain recognition of foreign-country money judgements in Michigan court. Allianz Suisse Versicherungs-Gesellschaft v. Miller, 24 F. Supp. 3d 670, 675 (W.D. Mich. 2014). The FCMJRA generally applies to a "foreign-country judgment to the extent that both of the following apply: (a) The judgment grants or denies recovery of a sum of money. (b) Under the law of the foreign country where rendered, the judgment is final, conclusive, and enforceable." M.C.L. §

9

The Netherlands is a "foreign country" as defined in M.C.L. § 691.1132 and the Judgment entered by the District Court of Noord-Nederland in the Netherlands is a foreign-money judgment within the meaning of the Act because it grants ECO recovery of a sum of money and the and is final, conclusive and enforceable under the law of the Netherlands.  M.C.L § 691.1133(1).

A party resisting recognition of a foreign-country judgment has the burden of establishing a ground for non-recognition set forth in M.C.L. § 691.1134.  M.C.L. § 691.1134(4).  Hamilton relies on two grounds for non-recognition.  First, the Dutch Court lacked personal jurisdiction over Hamilton.  Under M.C.L. § 691.1134(2)(b), a foreign judgment "shall" not be recognized if "the foreign court did not have jurisdiction over the defendant."  Hamilton also relies on M.C.L. § 691.1134(3)(e) which says that a court "need not recognize a foreign country judgment" if "[t]he proceedings in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in the foreign court."  Each ground will be addressed in turn below.

1.  Personal Jurisdiction

ECO first contends that the Dutch court had personal jurisdiction under Dutch law.  In the context of recognizing a foreign-country judgment, personal jurisdiction consists of notice under the foreign-country law that is reasonably calculated to apprise a defendant of the suit and amenability to the foreign court's jurisdiction.  See DeJoria v. Maghreb Petroleum Exploration, S.A., 804 F.3d 373, 386-88 (5th Cir. 2015).

Here, the Netherlands is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.  As

such, on February 6, 2015, Hamilton's Vice President of Operations, Christina McIlhenney was served with copies of the Dutch Writ of Summons according to Article 5 of the Hague Convention at Hamilton's Livonia address. The returned certificate of service is prima facie evidence that service was proper. See Northrup King v. Compania Productora Semillas Algodoneras Selectas, 51 F.3d 1383, 1389 (8th Cir. 1995). Moreover, Hamilton has not asserted that it did not receive notice of the Dutch suit. Indeed, Hamilton's counsel knew of the Dutch proceeding and informed ECO that his "firm will not accept service of the action brought in the Netherlands ...." (ECO's Ex. 55, 12/16/14 Ltr. from R. Perry).

Additionally, Dutch law provides for jurisdiction over a defendant that was obligated to pay a debt in the Netherlands. Hamilton does not dispute that it was obligated to pay ECO in the Netherlands. As such, the Dutch court had personal jurisdiction over Hamilton under Dutch law.

Hamilton, however, contends that the question is not whether personal jurisdiction lies under Dutch law, but rather Michigan law and its federal counterpart. Even assuming, without deciding, that Michigan and federal law apply, Hamilton is still subject to personal jurisdiction in the Netherlands.

In this diversity case, the Court must analyze personal jurisdiction under Michigan law and due process. Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 888 (6th Cir. 2002). Michigan's long-arm statute authorizes specific personal jurisdiction over a defendant that transacts "any" business within the state. See M.C.L. § 600.715(1). This includes "the purchase ... of goods in an attempt to make a profit." Oberlies v. Searchmont Resort, Inc., 633 N.W.2d 408, 413 (Mich. Ct. App. 2001).

"Neither the presence of the defendant in the state, nor actual contract formation need take place in the forum state for the defendant to do business in that state." Lanier v. Am. Bd. of Endodontics, 843 F.2d 901, 907 (6th Cir 1988). Rather, the "slightest act of business" within the state is enough. Neogen, 282 F.3d at 888.

Under this standard, Hamilton transacted business in the Netherlands. Hamilton knew ECO and its agents were located in the Netherlands. He chose to do business with a Netherlands company. He traveled to the Netherlands several times in furtherance of the business relationship. Hamilton negotiated and consummated a long-term deal with ECO and sent hundreds of orders and payments to the Netherlands. These contacts are sufficient to establish personal jurisdiction under Michigan law. See Salom Enters., LLC v. TS Trim Indus., Inc., 464 F. Supp. 2d 676 (E.D. Mich. 2006) (defendant transacted business in Michigan by "sen[ing] orders to the plaintiff in … Michigan, forward[ing] payments to the plaintiff in …Michigan, and [making] payments by wire transfer into the plaintiff's Comerica Bank account in Detroit." Id. at 684. The defendant also "telephonically negotiated the terms of the contract and consummated the deal with the plaintiff's agents, all the while knowing that the plaintiff's agents were located in Michigan." Id.)

As to federal law, the Sixth Circuit examines three factors to determine compliance with due process: (1) purposeful availment; (2) whether the defendant's forum contacts gave rise to the cause of action; and (3) whether the forum's exercise of jurisdiction was reasonable. See Neogen, 282 F.3d at 890.

Hamilton satisfies this test. First, Hamilton purposefully availed itself of the benefits of the Netherlands. With respect to interstate contractual obligations, "parties

who reach out beyond one state and create continuing relationships and obligations of citizens of another state are subject to regulation and sanction in the other state for the consequences of their activities." <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 473 (1985) (internal quotation marks omitted).  Hamilton created a continuing and ongoing relationship with ECO, a Dutch resident starting in 2003.  Hamilton reached out to find a supplier located outside of the United States and access to components not available in the United States, ultimately finding ECO.  After the first meeting in the Netherlands in February 2004, the parties discussed the joint development of a product to be sold in the United States.  For the next 11 months, the parties regularly communicated via email, exchanged draft proposals, and met twice more in person in the Netherlands to discuss product specifications, tasks for joint development of the product, and the potential business terms.  These negotiations directly led to the Working Agreement which, by its terms, envisioned Hamilton's continuing, wide-reaching contacts with ECO in the Netherlands.

Under the Working Agreement, Hamilton committed, over the course of at least three years, to purchase a minimum 7500 heat engines (worth about $16 million) manufactured and paid for in the Netherlands.  It also committed to cooperate with product returns and failures in production, provide product forecasts, and help find the "lowest cost for each shipment."  The parties communicated continuously for over a decade.  They had myriad in-person meetings, both in the Netherlands and in Michigan, in furtherance of their business.  Hamilton issued hundreds of purchase orders to ECO in the Netherlands and remitted hundreds of payments to ECO in the Netherlands.  Also, until 2009, Hamilton took title to products in the Netherlands.  Under these

circumstances, Hamilton's lack of physical presence in terms of an office or employees, upon which it heavily relies, is insufficient to overcome the strong ties with the Netherlands.

Second, EOC's cause of action was undeniably related to Hamilton's activity in the Netherlands because it arose in the wake of Hamilton's activity there, and the parties' business relationship "made possible" the cause of action.

Finally, and significantly, the Dutch court's exercise of jurisdiction was reasonable and comporting with due process. The reasonableness of jurisdiction is based on "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest in other states in securing the most efficient resolution of controversies." CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1268 (6th Cir. 1996).

Here, the burden on Hamilton of litigating in the Netherlands was reasonable given that Hamilton engaged in substantial negotiations in and traveled on multiple occasions to the Netherlands to do business with ECO. ECO has an interest in obtaining relief in the place where payments were to be made and where it manufactured the products that led to Hamilton's underlying debt. Further, the Netherlands has an interest in adjudicating a dispute involving a Dutch company and Dutch resources. Under these circumstances, the Dutch court's exercise of jurisdiction was not unreasonable.

Hamilton cites Calphalon Corp. v. Rowlette, 228 F.3d 718 (6th Cir. 2000) in support. In Calphalon, the Sixth Circuit held that the foreign court lacked personal jurisdiction over the defendant. The issue in Calphalon was whether the defendant, a Minnesota-based business, was subject to the jurisdiction of in the Northern District of

Ohio.  The plaintiff, an Ohio corporation, argued that the Ohio court had personal jurisdiction over the defendant because it had: (1) entered into a contract with plaintiff; (2) visited plaintiff's office in Ohio on a handful of occasions; and (3) sent various letters/faxes/etc. to plaintiff in Ohio and (4) the agreement had an Ohio choice of law provision. Id. at 722.  The district court found these contacts to be "fortuitous" and "attenuated," and held that personal jurisdiction did not exist.  Id. at 722-23.

As ECO contends, Calphalon is distinguishable.  Unlike Calphalon, Hamilton's contacts with the Netherlands arose because Hamilton sought to do business with a Dutch company.  Hamilton admittedly reached out to a company in the Netherlands to form a long-term, multi-million-dollar commercial relationship and then sent hundreds of orders and payments and thousands of communications to the Netherlands as a result of the relationship.  The Court in Calphalon did not identify any activity directed to the forum by the defendant.  Moreover, unlike the declaratory action in Calphalon, ECO's claim in the Netherlands sought economic damages that Eco experienced in the Netherlands based on Hamilton's failure to make payments in the Netherlands for goods that Hamilton ordered from the Netherlands.  In short, Calphalon does not control the outcome of this case.

Hamilton also relies on Koster v Automark Industries, 640 F.2d 77 (7th Cir. 1981).  In Koster, the plaintiff, a citizen of the Netherlands, sought to enforce a default judgment it obtained in the Netherlands against an Illinois defendant.  The parties' dispute stemmed from a contract pursuant to which defendant agreed to purchase 600,000 "valve caps" from plaintiff.  Id. at 78.  It was undisputed  that: (1) defendant did not sell goods or otherwise have a presence in the Netherlands; and (2) defendant's

15

only contacts with the Netherlands were the valve cap contract, and the communications/meetings/etc. related to the contract. Id. at 80. The court of appeals went on to highlight the lack of any meaningful connection between defendant and the Netherlands:

> [Defendant's] only contacts with the Netherlands were eight letters, and possibly a telegram and a transatlantic telephone call all preliminary to a meeting [with plaintiff] in Italy. . . The court notes that such contacts cannot be held to satisfy jurisdictional requirements, otherwise use of the interstate telephone and mail service to communicate with (an out-of-state) plaintiff, if constituting contacts supporting jurisdiction, would give jurisdiction to any state into which communications were directed. Such a result would make virtually every business subject to suit in any state with which it happened to communicate in some manner. That clearly would not satisfy the demands of due process.

Id. at 79 (citations omitted) (alteration in original).

Hamilton's reliance on Koster is misplaced. The defendant's contacts in the Netherlands in Koster involved a handful of letters and a contract with a Dutch company under which no commerce actually followed. As explained in detail above, Hamilton had far deeper contacts with the Netherlands than in Koster.

Finally, in its supplemental paper, Hamilton makes much of the Court's comment at the hearing that is was inclined to recognize the judgment because Hamilton had notice of the proceeding and make a deliberate choice to default. Hamilton is correct when it states that notice of a proceeding and personal jurisdiction are two separate concepts and that Hamilton had the right to not appear in the Dutch court and later challenge its jurisdiction. See Baldwin v. Iowa Traveling Men's Ass'n, 283 U.S. 522 (1931). The Court's comment was not meant to be interpreted that the fact that Hamilton failed to appear in the Dutch court despite having notice was a reason to enforce the judgment. Rather, the Court was merely observing that although Hamilton

had the right not to appear in the Dutch court, the decision not to appear was not without risk.

## 2.  Arbitration

Hamilton also contends that ECO's attempt to enforce the default judgment should be denied because the parties agreed to arbitrate their dispute.  As noted above, one of the grounds for non-recognition of a foreign judgment under the FCMJRA is that:

> The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court.

M.C.L. § 691.1134(3)(e).  Unlike the lack of personal jurisdiction, which is mandatory grounds for non-recognition, this ground is discretionary.

Regarding arbitration, under Article 19 of the Working Agreement, the parties agreed to the following:

> As good partners, Hamilton and EHS should settle disputes themselves. In the case parties cannot handle a dispute , the issue shall be settled face to face with Mr. Charles Fenner as an arbitrator. Swiss law is applicable to this working agreement.

ECO does not dispute the existence of the above clause.  However, ECO argues that Fenner's refusal to serve as the arbitrator renders the clause ineffective as a matter of law.  Hamilton disagrees.

At the outset, the parties disagree on what body of law controls whether the arbitration clause is viable.  ECO says Swiss law controls and under Swiss law, the arbitration provision is void because it is "impossible" to perform.  Hamilton says federal law controls because an arbitration provision in an international agreement is governed by the Convention on the Recognition of Foreign Arbitral Awards.

The Working Agreement provides an overall intent to arbitrate. While ECO makes much of the fact that it specifies Fenner as the arbitrator, the addition of language requiring the parties to act as "good partners," and to "resolve disputes themselves," further underscores an overriding intent to keep their disputes out of the court system.

That said, the Court in its discretion declines to invalidate the Netherlands judgement on the grounds that it was obtained in violation of the arbitration clause. The is particularly appropriate in light of the confusion over what body of law applies and the finding that the Dutch court had personal jurisdiction over Hamilton.

### B. Hamilton's Counterclaim

In addition to seeking to enforce the judgment, ECO also moves for summary judgment on Hamilton's counterclaim for breach of contract. ECO contends that the counterclaim (1) is barred by Michigan's 4 year statute of limitations, (2) lack merit. Hamilton says that ECO waived any statute of limitations defense by failing to plead it in its initial answer and that there are genuine issues of material fact as to the merits of its breach of contract claim.

### 1. Waiver

As to waiver, although ECO did not plead the statute of limitations in its initial answer, it did in its amended answer which the Court permitted ECO to file when it retained new counsel. Thus, ECO did not waive the statute of limitations defense.

### 2. Merits/Statute of Limitations

Regarding the merits of the counterclaim, although Hamilton asserts a single claim for breach of contract, it alleges several different breaches, as follows:

A. Improper engineering for vent design and sizing issues which cause water heaters to fail in the field;

B. The material used for the brass tees as boiler arm connectors was too thin causing numerous leaking components;

C. Failure to timely provide additional Model (999) to meet Hamilton's market needs;

D. Defective and improper ignition causing appliance and connected item damage;

E. Improper and defective ASME labeling on the heat exchangers resulting in Hamilton not being able to sell its product in several states and loss of its largest customer; and

F. Failure to provide promised new electronic controls.

(Doc. 8 at p. 4).

### a. Applicable law

Hamilton spends a good deal of time arguing that its claim is timely under Swiss law which he says carries a 10 year statute of limitations. This argument misses the mark. As explained in ECO's motion and supplemental paper, because the Court's jurisdiction is premised on diversity, it must apply the forum state's choice-of-law rules. See Spence v. Miles Labs., Inc., 37 F.3d 1185, 1188 (6th Cir. 1994). In cases involving contractual choice of law, "[a]bsent an express statement that the parties intended another state's limitations statute to apply, the procedural law of the forum governs time restrictions on an action for breach, while the law chosen by the parties governs the terms of their contract." Cole v. Mileti, 133 F.3d 433, 437-38 (6th Cir. 1998); accord Phelps v. McClellan, 30 F.3d 658, 662 (6th Cir. 1994) (observing that parties must expressly state an intent to include a foreign statute of limitations into a choice-of-law agreement before the forum's statute of limitations will be displaced).

The Michigan court of appeals recently confirmed that Michigan considers statutes of limitation to be procedural for choice-of-law purposes and will apply Michigan's statute of limitations notwithstanding the parties' contractual selection of another state's substantive law. Brazos Higher Ed. Service Corp. v. Stinnett, No. 329780, 2017 WL 1103459, at *3-4 (Mich. Ct. App. Mar. 23, 2017); see also Isley v. Capuchin Province, 878 F. Supp. 1021, 1025 (E.D. Mich. 1995) ("Under Michigan conflicts law, statutes of limitations are deemed to be procedural … and are to be governed by the law of the forum.").

Here, although the parties generally chose Swiss substantive law to govern the Working Agreement, they did not include expressly the Swiss limitations period in their agreement. As such, Michigan's statute of limitations applies to this case, not Swiss law.

Under Michigan law, Michigan's Uniform Commercial Code provides the relevant limitations period because Hamilton's claim is based on a transaction in goods. See M.C.L. §440.2012. Therefore, the limitations period is four years from "the date on which the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." M.C.L. § 440.2725(1)-(2). Here, the breach occurs when the goods are tendered. See M.C.L. §440.2725(2). Thus, a plaintiff has four years from tender of delivery in which to commence a cause of action, regardless of when damages are suffered. See Snyder v. Boston Whaler, Inc., 892 F. Supp. 955, 959 (W.D. Mich. 1994) (holding that the 1992 breach-of-contract claim was time-barred where the plaintiff took delivery in 1984 but suffered damage in 1991 and 1992).

Here, Hamilton filed its counterclaim on October 16, 2015 and thus its claims are

barred if the relevant goods were tendered before October 16, 2011.  ECO says that

there is no genuine dispute that all goods related to the improper-vent design

claim were tendered to Hamilton by 2010.  Each alleged breach will be considered in

turn below.

### b.  Vent Design

Hamilton first says that the goods [heat engines] were nonconforming because of

"[i]mproper engineering for vent design …."4  (Doc. 8 at ¶ 9(A); Ex. 24 at 26-27).

However, Deal testified at a 30(b)(6) deposition that Hamilton first identified this alleged

defect in 2005, when it received a complaint from a customer.  (ECO's Ex. 24, 30(b)(6)

Dep. of Deal at p. 27-28).  And Hamilton admits that the alleged defect was resolved in

2010.  (Id. at 28-29).  Because any heat engine with this supposed defect was tendered

no later than 2010,  Hamilton's claim accrued no later than 2010.

### c.  Material Problem

Hamilton also says that ECO's heat engines were flawed because the "material

used for the brass tees as boiler arm connectors was too thin causing numerous leaking

components."  (Doc. 8 at ¶ 9(B)).  According to Deal, ECO began providing the allegedly

defective brass tees in 2009 (ECO's Ex. 24, 30(b)(6) Dep. of Deal at p. 29) and the

problem was corrected in 2009 or 2010, (id. at 31).  Thus, the brass tees would have

been tendered to Hamilton no later than 2010.  Hamilton's claim for breach therefore

accrued no later than 2010.  Because Hamilton did not file its claim until October 16,

2015, it is untimely.

### d.  ASME Labeling

Hamilton next accuses ECO of "[i]mproper and defective ASME labeling on the

heat exchangers." (Doc. 8 at ¶ 9(E)). This claim relates to an alleged inconsistency between the labeled capacity of the heat exchanging component of the boilers Hamilton sold and the labeled capacity of the safety relief valve installed on the boilers. (ECO's Ex. 2, Dep. of Deal at p. 133-35; Ex. 24 at 37). Hamilton blames ECO for the allegedly inconsistent labels.

ECO first says this claim fails because there is no genuine issue of material fact over whether ECO was responsible under the Working Agreement to ensure that all of the labels on the finished boilers that Hamilton sold were proper. It was not. Rather, ECO was required to provide semi-finished heat engines "suitable to the US and built according to the specifications and requirements of the ETL[1] approval." (ECO's Ex. 8, Working Agreement, Art. 1, ¶ 1 5 (emphasis added).

At his disposition, Deal admitted that he is not aware of any time in which ECO's heat engines did not meet the ETL's requirements, (ECO's Ex. 2, Dep. of Deal at p. 70), and that all of the heat engines that Hamilton received from Eco met the ETL requirements, (id. at 71). In fact, ETL itself concluded in 2012 that based on its interpretation of the applicable standards—the interpretation on which Eco relied—the products' labeling was not improper. (See ECO's Ex. 44, 12/31/13 Memo from J. Deal).

Additionally, ECO points out that Giannoni France, a French company sold the heat exchangers sold them to ECO with labels already affixed. (See ECO's Ex. 2 Dep. of Deal at p. 133). Moreover, because Hamilton maintained contact with ETL, (id. at p. 60; Ex. 8, Art. 6, ¶ 1), and identified itself as the only applicant on the ETL certifications,

---

[1]ETL stands for ETL Testing Laboratories, Inc., an agency the parties agreed to use for the testing and certification of the product.

only Hamilton received information regarding the certifications directly from ETL (see ECO's Ex. 10, Dec. of Rob Witwerts as Managing Director at ECO at ¶ 16). And only Hamilton could label the finished product (see ECO's Ex. 2 Dep. of Deal at p. 61 ("We [Hamilton] are listed as the final point of affixing the label, the ETL label.")). As such, Hamilton, not ECO, installed and labeled the safety relief valve for the finished product. (See ECO's Ex. 2, Dep. of Deal at p. 67, 131; Ex. 51, 4/8/10 Ltr. from J. Deal). Thus, Hamilton cannot show that ECO breached the Working Agreement regarding ASME labeling.

ECO also says that even if Hamilton could show a breach based on the labeling, the statute of limitations bars claims on any unit tendered before October 16, 2011. In light of finding that ECO was not responsible for the labeling, it is not necessary to consider this argument.

### e. Excited Ignitions

Hamilton additionally claims that ECO failed to supply conforming goods because of "[d]efective and improper ignition causing appliance and connected item damage." (Doc 8 at ¶ 9(D)). Hamilton described this as "excited ignitions," which is "a loud explosion instead of a quiet ignition." (ECO's Ex. 2, Dep. of Deal at p. 119).

ECO first says this claim is barred by the statute of limitations because there is no genuine dispute that the boilers involved were tendered to Hamilton more than four years before the counter-complaint was filed.

The record show that on November 3, 2011 Hamilton identified "all known sites" with exited ignitions. (ECO's Ex. 47, 11/3/11 Email with Attachment). Hamilton later produced a spreadsheet showing that the boilers involved were either installed or

23

experienced their first excited ignition before October 16, 2011, necessarily meaning that Eco tendered the boilers to Hamilton before October 16, 2011. (ECO's See Ex. 48, 12/7/11 Email and Attachment; see also ECO's Ex. 2, Dep. of Deal at p. 59-60). For the one location not identified on Hamilton's spreadsheet, Auburn YMCA, Hamilton's records show that this boiler was installed well before October 16, 2011. (See Ex. 49, 7/15/11 Invoice; Ex. 50, EVO Start Up Checklist).

Based on the above, Hamilton's claim for breach based on excited ignitions is time barred.

ECO also says this claim fails because Hamilton cannot show a breach. The Court agrees. Deal testified that excited ignitions occur when gas builds up in a boiler and then explodes upon ignition. (Ex. 2 at 135). Hamilton does not know what causes the buildup of gas. (Id. at 119). As of January 2012, Hamilton had no reason to think that excited ignitions were caused by anything but improper installations, (Ex. 46, Email Chain), and it does not know how many reported excited ignitions were due to improper installations (see Ex. 24 at 35). Even now, Hamilton cannot say why ECO's product experienced excited ignitions: "I don't know why their product does it." (See id. at 49-50). Indeed, aside from knowing that certain actions with respect to the gas and electric supply might resolve the issue (id. at 34; Ex. 2 at 145-46), Hamilton is not aware of any facts showing that any boiler supplied by ECO actually had a defect that caused an excited ignition. (Ex. 24 at 56 ("Q: As you sit here today, you do not know what about the product causes excited ignitions, is that correct? A. We've not been notified by [Eco] what the problem is.")). In other words, Hamilton has no proof that any particular unit had a defect. Thus, he cannot as a matter of law establish that ECO

24

breached any obligation regarding excited ignitions.

### f. Model 999 and New Electronic Controls

Hamilton also says that ECO breached the Working Agreement by failing to (1) "timely provide additional Model (999) to meet Hamilton's market needs" (Doc. 8 at ¶9©), and (2) "provide promised new electronic controls." (id. at ¶ 9(F)).

ECO says these claims fail because no contract imposed these obligations on ECO. The Court agrees. First, Hamilton admits that there was never a formal agreement between Hamilton and ECO to develop and sell a Model (999). (ECO's Ex. 24, 30(b)(6) Dep. of Deal at p. 32; Ex. 10, ¶ 21). Second, Hamilton admits that there was never an agreement between ECO and Hamilton that required ECO to supply updated controls to Hamilton. (Ex 24 at 188; Ex. 10, ¶ 22). Therefore, Hamilton cannot prove a breach of contract for failing to provide either a Model (999) or updated electronic controls.

### 3. Hamilton's response

In response, Hamilton does not present evidence to rebut ECO's showing that Hamilton's claims based on defective brass tees, improper vent design and excited ignitions accrued more than four years before Hamilton filed its counterclaim. Instead, Hamilton says that it has experienced damages from the alleged breaches within the limitations period. Hamilton relies on an affidavit of Deal and a statement of damages, the latter of which does not contain any dates. The fact that Hamilton may have suffered damages during or even after the expiration of the statute of limitations is not relevant. The statute begins to run when the goods are tendered, M.C.L. § 440.2725(2), and bars claims that are filed more than four years after that date

25

irrespective of when damages arise. Hamilton has not provided any legal authority to support its position that the fact it suffered damages before the statute expired saves his claims. Indeed, such an argument would indefinitely extend the limitations period beyond four years.

Moreover, Hamilton's damages calculation, and assertion that problems occurred after October 16, 2011 (Doc. 40, ¶74), does not genuinely refute the record evidence submitted by ECO that the heat exchangers related to brass tees, vent design and excited ignitions were all tendered more than four years before Hamilton filed its counterclaim.

Overall, Hamilton's claims are time barred under Michigan law. And to the extent any claims are timely, Hamilton did not present evidence to establish a question of fact as to whether ECO breached the Working Agreement, or any other agreement between the parties.

## VI. Conclusion

In the end, when Hamilton was served with process from the Dutch court and chose not to respond, it was at risk of being found liable for the debt being asserted. It was also at risk of a liability judgment being enforced. In today's commercial environment with the magnitude of international trade, it is not reasonable to take a parochial view of personal jurisdiction.

For the reasons stated above, ECO's motion for summary judgment is GRANTED. The judgment shall be enforced. Hamilton's counterclaim is DISMISSED. The Court will enter a judgment consistent with this order.

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: May 5, 2017
      Detroit, Michigan